UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INDIA TUBBS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:20-CV-00695 |
| v. | ) | |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | Judge Edmond E. Chang |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

India Tubbs brings this employment discrimination suit against her employer, the Chicago Transit Authority (commonly known as CTA). R. 33, Second Am. Compl.[1] CTA moves for summary judgment on Tubbs's hostile work environment and gender discrimination claims. R. 102, Def.'s Mot. As explained below, CTA's motion is denied in part and granted in part.

## I. Background

In deciding CTA's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, India Tubbs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Tubbs is a CTA Bus Operator. R. 104, DSOF ¶ 2. She worked in CTA's Forest Glen garage from 2018 until she moved to the Kedzie garage in 2019, and then moved to the Chicago Avenue garage in 2021, where she currently works. *Id.* ¶ 4.

---

[1]The Court has subject matter jurisdiction over the Title VII claims under 28 U.S.C. § 1331. Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

Tubbs endured two separate incidents in 2019 involving Cameron Maloney, another Bus Operator. In September, when Tubbs was on duty at the Kedzie garage, Maloney grabbed Tubbs's forearm and said "hey, beautiful" and "where are you going, you look good." DSOF ¶ 70; R. 114-9, Tubbs Dep. at 103:6–104:15, 106:2–108:13. Tubbs responded "don't grab me like that" and "who are you." DSOF ¶ 70; Tubbs Dep. at 104:6–7, 107:7. Maloney responded "dang[] [o]kay" and "you're beautiful to me, I just wanted to know where you was going." DSOF ¶ 70; Tubbs Dep. at 108:7–9. In her deposition, Tubbs stated that her supervisor William Carey personally witnessed this interaction from about 10 feet away behind a glass window. DSOF ¶ 71; Tubbs Dep. at 110:8–23. Tubbs also stated that she immediately went to Carey's office and complained to Carey about it, and Carey acknowledged that he saw the incident and said "that's what he do" and "he's just crazy," and "that's just what Cameron does" or "he does things like that." R. 113, PSOF ¶ 6; Tubbs Dep. at 108:9–110:7, 201:13–19, 226:1–5. Carey, for his part, does not remember observing or discussing this incident with Tubbs in September 2019. PSOF ¶ 7; R. 114-4, Carey Dep. at 23:17–23.

The second incident happened two months later. At the beginning of Tubbs's shift, her bus was blocked by two other buses, one of which Maloney operated. Maloney refused Tubbs's request to move his bus. PSOF ¶ 8; Tubbs Dep. at 42:7–43:23. So Tubbs bent over the empty driver seat to speak out the window to the other bus operator. *Id.* Maloney then walked behind Tubbs while she was bent over, grabbed her buttocks, at a spot around two inches from her genitalia, and squeezed her buttocks while making sexually suggestive comments. PSOF ¶ 8; Tubbs Dep. at 91:8–94:16,

2

211:4–213:2. Tubbs stated that Maloney was saying "perverted things" and making sexually suggestive comments when he did this, including that she "was thick as fuck" but Tubbs does not recall all of the specifics because she was "in defense mode" and trying to protect herself. *Id.*; Tubbs Dep. at 43:16–19.

Tubbs reported the November 2019 incident to her supervisor Robert Mitchell on the same day. PSOF ¶ 9; Tubbs Dep. at 44:2–15. According to Tubbs, Mitchell responded that he "didn't want anything to do with it." *Id.* Also on the same day, Tubbs reported the incident to Carey. According to Tubbs, Carey asked her if he was correct in remembering that Maloney had already touched her before, and then instructed Tubbs to fill out a Report to Manager form. PSOF ¶ 10; Tubbs Dep. at 44:11–18; R. 114-10, PSOF Exh. 10. On the form, Tubbs reported that "the operator grabbed my rear end and the pushed him off me. … This was the second time I told him not to touch me!" DSOF ¶ 23; PSOF Exh. 10. Carey called his supervisor, Lulvet Cooper, and emailed Cooper Tubbs's report. DSOF ¶ 24; Carey Dep. at 30:20–31:1; R. 104-1, DSOF Exh. 22. The parties dispute whether Tubbs wanted to complete a written report or was encouraged to do so by Carey and Cooper. *See* R. 112, Pl.'s Resp. DSOF ¶¶ 25–26. Carey removed Tubbs from the schedule for the rest of the day so she would not run into Maloney, who was on the same bus route, and requested the video recording from the bus where the incident took place. DSOF ¶ 28; Carey Dep. at 32:23–33:2, 34:5–7, 53:3–59:19; R. 104-1, PSOF Exhs. 24, 25.

The next day, Tubbs discussed the incident with Cooper in person. PSOF ¶ 13; Tubbs Dep. at 45:14–46:10. Cooper told Tubbs that the complaint could stay in her

3

office or she could have a "heart to heart" with Maloney. *Id.* Tubbs responded that she did not want any contact with Maloney and wanted him disciplined. *Id.* During this meeting Tubbs told Cooper she did not want to encounter Maloney in the workplace. R. 117, Def.'s Resp. PSOF ¶ 14; R. 114-7, Cooper Dep. at 28:3–16. Cooper offered to change Tubbs's route to avoid interacting with Maloney, which she did. DSOF ¶ 30; Cooper Dep. at 27:2–18; Tubbs Dep. at 187:6–20, 221:3–6.

On November 18, 2019, five days after the incident, Anthony Betts, the General Manager, viewed the video recording of the incident, as did Nita Knowles and Amber Victorson. DSOF ¶ 33; R. 114-5, Betts Dep. at 23:21–24:18; R. 114-11, Victorson Dep. at 55:6–11; R. 114-8, Knowles Dep. at 30:7–31:9; *see* R. 109, DSOF Exh. 18. Betts did not report the incident to CTA's equal employment office (EEO). Betts Dep. at 26:11–13. Victorson testified that Betts instructed her *not* to remove Maloney from service, and Knowles testified that Betts did not order her to remove Maloney from service, though Betts testified that he did tell them to remove him from the schedule. PSOF ¶ 25; Betts Dep. at 25:14–21; Knowles Dep. at 27:5–10; Victorson Dep. at 49:7–17.

Tubbs also spoke to Amber Victorson, a Bus Operations Manager, about the incident with Maloney. Victorson told Tubbs that she had seen the video recording of the incident. Victorson also told Tubbs that she was not surprised, because "it[']s just something [Maloney] does." PSOF ¶ 17; Tubbs Dep. at 189:19–190:24. Tubbs testified that Victorson told Tubbs that she personally sent Tubbs's complaint to the EEO office (although Tubbs claims this was a lie). PSOF ¶ 17; Tubbs Dep. at 242:11–19.

4

According to Victorson, Tubbs seemed "emotionally overwrought" and "wanted to change garages because she was not comfortable with Maloney. PSOF ¶ 19; Victorson Dep. at 22:22–23:8. Victorson told Tubbs that she thought Maloney's behavior was funny. Tubbs Dep. at 189:19–190:24. She also was aware of workplace rumors that Maloney had a crush on Tubbs and was "really kind of like semi stalking her because he really liked her" but Tubbs "had turned him down." PSOF ¶ 19; Victorson Dep. at 20:4–9.

Tubbs also reported the incident to Nita Knowles, another Bus Operations Manager. PSOF ¶ 21; Knowles Dep. at 42:10–43:6. Knowles testified that Tubbs came to her office "super upset" about the harassment and because "it didn't seem like anything was being done about it" even though she had already told a manager. *Id.* Knowles herself had an experience with someone whom she believes was Maloney that she says was "extremely disrespectful" and, although she could not remember the details of what he said to Knowles, "it could have been sexual in nature." PSOF ¶ 21; Knowles Dep. at 32:12–33:22. At the time of her own interaction with Maloney, she told Victorson that she "did not ever want to have a conversation with him anymore … because Cameron is extremely disrespectful." *Id.*

On November 22, 2019, Tubbs took matters into her own hands and contacted the Human Resources Department and then the EEO Unit about her complaint, and was informed that the EEO Unit did not have any record of her complaint. PSOF ¶ 27; DSOF ¶ 51; Tubbs Dep. at 49:2–19, 144:10–19; R. 114-12, Chatterji Dep. at 22:13–23:6. The EEO Unit instructed Tubbs to fill out an EEO complaint form and

5

report to Betts about the incident, which Tubbs did. PSOF ¶¶ 27–28; Tubbs Dep. at 140:13–141:7, 143:7–144:19. The same day, Knowles removed Maloney from service on Betts's instruction. DSOF ¶ 58; Knowles Dep. at 36:19–37:7. Tubbs testified that between the day of her incident with Maloney on November 13 and when he was removed from service nine days later on November 22, she saw Maloney at least two times but did not interact with him and stayed in the manager's office to avoid him. DSOF ¶¶ 65, 79; Tubbs Dep. at 75:18–24, 88:23–89:22, 90:13–18.

EEO Unit Investigator Souroth Chatterji investigated the incident and interviewed Betts, Cooper, Carey Victorson, Knowles, Tubbs and Maloney. DSOF ¶ 54; R. 104-2, DSOF Exh. 26; Chatterji Dep. at 15:6–12. Maloney was ultimately discharged on February 12, 2020. DSOF ¶ 63; R. 104-2, DSOF Exh. 50. The EEO Unit also concluded that Cooper and Betts violated CTA's sexual harassment policy by failing to report Tubbs's November 13 complaint within two days of receiving it and that Betts made false statements about his handling of Tubbs's complaint. DSOF ¶ 67; Chatterji Dep. at 36:9–37:14, 39:6–40:21. As explained in more detail below, Tubbs testified that she was harassed by her coworkers for reporting the incident with Maloney. PSOF ¶¶ 33–35; Tubbs Dep. at 191:14–193:19, 250:15–254:13, 257:1–261:21, 271:9–272:15, 299:16–300:9.

Following the November incident, Tubbs made an injury-on-duty claim for anxiety and was referred to Dr. Frederick Bylsma, a clinical psychologist. DSOF ¶¶ 37–39; R. 104-2, Bylsma Dep. at 28:20–29:7. At Tubbs's first appointment with Dr. Bylsma on November 26, 2019, he determined that Tubbs was unable to safely work

as a CTA bus operator. DSOF ¶ 42; R. 105, DSOF Exh. 34 (sealed). Dr. Bylsma recommended that Tubbs be assigned to light duty at another garage where Maloney did not work; it was not until over one month later, on January 2, 2020, that Dr. Bylsma determined that Tubbs was fit to return to her full duties as a bus operator. DSOF ¶¶ 43–48; R. 105, DSOF Exhs. 37–39 (sealed).

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party

7

must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

As the Court explained in denying CTA's motion to dismiss the Second Amended Complaint, Tubbs labels her claims under one "Count I" heading, but the pleading sets forth two distinct claims—one for sexual harassment and the other for sex discrimination. *Tubbs v. Chicago Transit Authority*, 2022 WL 971882, at *3 (N.D. Ill. Mar. 31, 2022). CTA now moves for summary judgment on both claims. *See* Def.'s Mot.

### A. Harassment

To establish a claim under Title VII for a sexually harassing hostile work environment, a plaintiff must show that (1) she was subjected to unwelcome conduct; (2) the conduct was based on membership in a protected class; (3) the conduct was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) that there is a basis for employer liability. *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (cleaned up).[2] Under the third factor, the unwelcome conduct must "be severe or pervasive from both a subjective and an objective point of view." *Id.* According to the CTA, summary judgment is appropriate because the record does not show that Tubbs experienced

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

8

subjectively and objectively severe and pervasive conduct, and there is no basis for employer liability. R. 103, Def.'s Br. at 3.

The CTA argues that Tubbs did not experience severe and pervasive misconduct as a matter of law, citing Seventh Circuit cases which the CTA characterizes as "more objectionable" than the facts in this case. Def.'s Br. at 7–8 (citing *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705 (7th Cir. 1995); *Saxton v. AT&T, Co.*, 10 F.3d 526, 534–35 (7th Cir. 1993); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993)). The CTA also argues that Tubbs experienced at best only two isolated incidents, and the misconduct was not pervasive enough to alter the conditions of Tubbs's employment. Def.'s Br. at 3–5. Tubbs responds that a co-worker's physical contact with intimate body parts does amount to severe harassment in this Circuit. Pl.'s Resp. at 4–5 (citing *Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001); *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691–93 (7th Cir. 2010); *Patton v. Keystone RV Co.*, 455 F.3d 812 (7th Cir. 2006)).

Evaluating the record in the light most favorable to Tubbs, she suffered two incidents of physical contact from Maloney.[3] When Maloney first grabbed her forearm, she told Maloney not to touch her. DSOF ¶ 70; Tubbs Dep. at 103:6–104:15, 106:2–108:13. Less than two months later, Maloney grabbed Tubbs's buttocks when the two of them were alone on a bus. PSOF ¶ 8; Tubbs Dep. at 91:8–94:16, 211:4–

---

[3]Tubbs also argues that she experienced harassment from other coworkers after she reported the November incident to her managers. As explained in the discussion of employer liability, these allegations are not substantiated by the record: Tubbs's testimony does not identify specific coworkers except for Mitchell, and even drawing factual inferences in Tubbs's favor, there is no reasonable way to impose liability on CTA as to what Mitchell did.

9

213:2. The facts in this case are similar enough to *Patton* to deny CTA's motion. 455 F.3d at 816–17. There, the Seventh Circuit explained that "physical harassment lies along a continuum," where some "instances of physical contact … have the potential to be among the most severe and psychologically damaging types of sexual harassment." *Id.* (cleaned up). Just one incident of "direct contact with an intimate body part" can establish a hostile work environment. *Id.* This kind of contact includes "touching of the breast near the nipple for several seconds" or putting a hand under someone's shorts on her inner thigh and touching her underwear (and does not require contact with the vagina). *Id.* (cleaned up). The Seventh Circuit has "repeatedly stressed that the phrase severe or pervasive is disjunctive," meaning that "even one act of harassment will suffice if it is egregious." *Lapka v. Chertoff*, 417 F.3d 974, 983 (7th Cir. 2008) (cleaned up).

Tubbs testified that Maloney "grabbed under my butt cheek" and "squeezed it," within two inches of her genitalia. Tubbs Dep. at 211:20–24, 212:10–14. At the summary judgment stage, reasonable factual inferences must go in Tubbs's favor. A reasonable juror could credit Tubbs's testimony and conclude that Maloney directly contacted her intimate body part. Whether the conduct was objectively severe or pervasive in these circumstances is a factual question for the jury, and the CTA has not established that Tubbs failed to show severe or pervasive misconduct as a matter of law. The CTA also argues that the September incident with Maloney was not subjectively severe to Tubbs because she did not report it formally to her managers. Def.'s Br. at 4. But Tubbs stated that she told her supervisor Carey about it immediately,

Carey asked her after the second incident if she had already had an issue with Maloney, and she also wrote in her written report about the November incident that it was the second time she had a problem with Maloney. PSOF ¶¶ 5, 10; Tubbs Dep. at 108:9–110:7, 201:13–19, 226:1–5; DSOF ¶ 10; Tubbs Dep. at 44:11–18; DSOF ¶ 23; PSOF Exh. 10. This is enough to establish Tubbs's subjective experience at the summary judgment stage, and a reasonable juror could credit Tubbs's testimony that she considered the harassment from Maloney to be severe or pervasive.

The CTA next argues that there is no basis for employer liability, because the CTA was not on notice about Maloney's behavior. Def.'s Br. at 9–12. A negligence standard applies to hostile work environment claims based on coworker conduct (as opposed to a supervisor's conduct): "the plaintiff must show that the employer has been negligent either in discovering or remedying the harassment." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (cleaned up). An employer "can avoid liability for coworker harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (cleaned up). The CTA argues that because Carey was 10 feet away and could not hear the conversation between Tubbs and Maloney in September, the CTA was not on notice about the harassment at that point. Def.'s Br. at 9–11. And according to the CTA, Tubbs's managers took prompt and effective action after Tubbs reported the November incident. *Id*. at 11.

There is enough evidence on the record, drawing reasonable inferences in Tubbs's favor, to establish employer liability at the summary judgment stage. Tubbs

11

testified that she reported the September incident to her supervisor Carey immediately, and he merely responded "that's what he do" and "he's just crazy," and "that's Cameron, that's something he does" or "he does things like that." PSOF ¶ 6; Tubbs Dep. at 108:9–110:7, 201:13–19, 226:1–5. Based on that alleged response by Carey, a reasonable juror could conclude that Carey was already aware of Maloney's behavior problems even *before* the September incident. The CTA responds that Tubbs's testimony about what Carey said is inadmissible hearsay, but Tubbs is reporting what *Carey* said to her, so it is a party-admission from her supervisor that Tubbs has personal knowledge of, thus qualifying it as a hearsay exemption and admissible. And even absent this response from Carey, a reasonable juror could conclude that Tubbs's reporting to Carey in September, before the November incident, was sufficient to put the CTA notice, meaning that the CTA acted negligently in failing to remedy Maloney's subsequent harassment. These inferences are further supported by Victorson's testimony that she knew Maloney was "semi-stalking" Tubbs. PSOF ¶ 19; Victorson Dep. at 20:4–9.[4]

That said, Tubbs's allegations about harassment from her *coworkers* following the November incident are not a basis for employer liability for the CTA. *See* Pl.'s Resp. at 8, 11–12. Tubbs dedicates two paragraphs in her statement of additional facts to this harassment. According to Tubbs, (1) Mitchell told her that he discussed her complaint with her coworkers and with Maloney, PSOF ¶ 33; Tubbs Dep. at

---

[4]The testimony from Knowles about a prior disrespectful interaction with Maloney is too vague and unspecific to qualify as notice to CTA; Knowles could not remember the details and could not definitively say that the interaction was sex-based in nature. PSOF ¶ 21; Knowles Dep. at 32:12–33:22.

128:21–129:11, 251:4–254:13; (2) a Bus Operator named Malcolm Robinson told her that he did not believe her allegations about Maloney (which she did not report), PSOF ¶ 34; Tubbs Dep. at 191:13–192:4, 258:7–16; (3) other coworkers made similar comments on a nearly daily basis (which she did not report), PSOF ¶ 34, Tubbs Dep. at 191:13–193:19, 251:5–254:13, 299:8–300:9; and (4) a coworker accused Tubbs of wanting Maloney to assault her (which she also did not report), PSOF ¶ 34, Tubbs Dep. at 258:17–259:7. Only Mitchell's comments are recounted in enough detail for the Court to evaluate, and Tubbs's testimony about Mitchell was that other coworkers asked Mitchell what happened because they did not think it was true. Tubbs Dep. at 253:21–254:13. Although Mitchell should not have revealed any details of the incident to Tubbs's coworkers, a reasonable juror could not conclude based on this conversation as related by Tubbs that the CTA was negligent in discovering or remedying the alleged harassment from Tubbs's coworkers after the November incident.

As explained above, however, because the CTA has not established as a matter of law that no reasonable juror could conclude that Tubbs experienced sexual harassment from Maloney in November 2019 and the CTA was negligent in addressing this harassment given the September 2019 incident, the CTA's motion for summary judgment on this claim is denied.

### B. Sex Discrimination

To survive summary judgment on her sex discrimination claim, Tubbs must "demonstrate she suffered an adverse employment action." *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012); *see Lewis v. City of Chicago*, 496 F.3d 645,

13

652–53 (7th Cir. 2007). To be actionable, an "adverse action must materially alter the terms and conditions of employment." *Stutler v. Illinois Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001); *see also Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). An adverse action must be "more than a mere inconvenience or an alteration of job responsibilities." *de la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008) (cleaned up). "Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in ... financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). As the Court explained in denying the CTA's motion to dismiss the Second Amended Complaint, "constructive discharge occurs when an employer makes an employee's working conditions so intolerable that an employee is forced into involuntarily resignation." *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009). The allegations must establish "a more egregious situation than a hostile work environment because an employee is normally expected to continue working while seeking redress." *Id.* In short, the employee must allege that "her working conditions were so objectively intolerable that they forced a change in employment status." *EEOC v. Costco*, 903 F.3d at 629.

The CTA argues that there is no adverse employment action here, because Tubbs remains in her Bus Operator position and has the same job duties that she had

14

prior to Maloney's misconduct. Def.'s Br. at 14. The CTA also argues that Tubbs's decision to go on injury-on-duty leave was voluntary, so it was not an adverse employment action. *Id.* at 14–15. Tubbs responds that the adverse employment action is the hostile work environment that she experienced from Maloney's actions, her managers' (lack of) response to her complaints, and the comments that she endured from her coworkers after she complained about the misconduct, all of which caused her (as evidenced by Dr. Bylsma's determination) to be temporarily unfit to work. Pl.'s Resp. at 13. It appears, then, that Tubbs contends that she was effectively constructively discharged and forced to take medical leave because of the hostile work environment. *See id.*

Neither party clearly lays out the dates of Tubbs's leave and when she was paid (or not) during that leave. Tubbs states only that she "was charged with a sick book violation and received a suspension resulting loss of pay when she took time off from work due to the effects of being sexually harassed by Cameron Maloney." PSOF ¶ 37; *see* Tubbs Dep. at 18:17–19:20, 83:17–84:18, 163:2–19, 265:24–267:21. From Dr. Bylsma's treatment notes, he first saw Tubbs on November 26, 2019, and in her treatment plan he recommended "no return to CTA bus operations until cleared to do so" and (presumably after she was cleared) "light duty at a garage different from the one where the man who assaulted her is working." DSOF Exh. 34 (sealed). On December 6, 2019, Dr. Bylsma recommended the same treatment plan and in his session notes wrote Tubbs "plans to return to work doing light duty." DSOF Exh. 37 (sealed). On December 14, 2019, Dr. Bylsma again gave the same treatment plan, but in session

15

notes wrote Tubbs "had begun doing light duty that has been discontinued since she is not receiving [workers compensation] benefits. She worked for two days and was sent home on the third day." DSOF Exh. 38 (sealed). Finally, on January 2, 2020, Dr. Bylsma cleared Tubbs for a return to full work duties. DSOF Exh. 39 (sealed). So the record does not support the Second Amended Complaint's allegation that Tubbs missed two months of work, though there may have been at least some days in November or December (or both) that Tubbs did not work. *See* Second Am. Compl. ¶ 31.

In any event, Tubbs has not cleared the very high bar for a sex discrimination claim based on constructive discharge. Whereas there is a negligence standard for hostile work environment claims, for sex discrimination the CTA must have made Tubbs's "working conditions so intolerable that [she] [wa]s forced into involuntary resignation," assessed "from the viewpoint of a reasonable employee." *Roby*, 579 F.3d at 785. On November 13, 2019, the same day as the incident, Cooper changed Tubbs's schedule so that she did not work with Maloney. DSOF ¶¶ 28, 30; Carey Dep. at 32:23–33:2, 34:5–7, 53:3–59:19; Cooper Dep. at 27:2–18; Tubbs Dep. at 187:6–20, 221:3–6. Nine days later, on November 22, Maloney was removed from service once the EEO Unit's investigation was initiated, DSOF ¶ 58; Knowles Dep. at 36:19–37:7, and Maloney was ultimately discharged in February 2020, DSOF ¶ 63; R. 104-2, DSOF Exh. 50. Although nine days passed between the incident and Maloney's removal from service, and Tubbs had to proactively seek out the EEO Unit's assistance, Tubbs testified that she never interacted with Maloney after that day, and only saw him in the same workplace a few times. DSOF ¶¶ 65, 79; Tubbs Dep. at 75:18–24,

16

88:23–89:22, 90:13–18. And as explained above, Tubbs's allegations of harassment from coworkers following the incident lacked details sufficient for the Court (or a jury) to evaluate. Even drawing inferences in Tubbs's favor, no reasonable juror could conclude that Tubbs's working conditions became so intolerable that she had no choice but to resign.

Finally, the Court notes that the CTA takes issue with Tubbs's lack of an identified comparator, arguing that Tubbs must make her case using the *McDonnell Douglass* burden-shifting framework. Def.'s Br. at 15; R. 118, Def.'s Reply at 15. Tubbs is correct that the *McDonnell Douglass* approach is just one way of showing a discrimination claim under Title VII at the summary judgment stage, so just because Tubbs has not identified a comparator does not doom her discrimination claim. *See Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2017); *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); Pl.'s Resp. at 14. But because the record does not support that Tubbs suffered an adverse employment action, the CTA's motion for summary judgment on the sex discrimination claim is granted.

17

## IV. Conclusion

The CTA's motion for summary judgment on Tubbs's sexual harassment claims is denied as to the Maloney-created hostile work environment. The motion is granted on the sex discrimination claim. The parties shall start settlement negotiations and otherwise confer on the next step of the litigation, and file a status report by January 13, 2025.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 23, 2024